IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

STACIA GALVIN-STOEFF,            )
                                 )
        Plaintiff,               )
                                 )
        v.                       )            NO. 11-3423
                                 )
ST. JOHN'S HOSPITAL OF THE       )
HOSPITAL SISTERS OF THE          )
THIRD ORDER OF ST. FRANCIS,      )
an Illinois not-for-profit corporation, )
                                 )
        Defendant.               )

OPINION

RICHARD MILLS, U.S. District Judge:

Pending is the Defendant's Motion for Summary Judgment.

I. INTRODUCTION

Plaintiff Stacia Galvin-Stoeff ("the Plaintiff" or "Galvin-Stoeff") was

an employee of Defendant St. John's Hospital of the Hospital Sisters of the

Third Order of St. Francis ("the Defendant," "St. John's" or "the Hospital")

as a Transfusion Service Specialist and classified as a Medical Technologist

II ("Med Tech II").

The Defendant is an Illinois not-for-profit corporation located in

Springfield, Illinois, which provides healthcare services to individuals. The Plaintiff is an adult female and Illinois resident. She began her employment as a Med Tech II in the Transfusion Services Area of the Hospital's Laboratory Department on June 7, 2004. At all relevant times, the Plaintiff's supervisor was Gale Dial, Transfusion Manager. Dial reported to Ann Cox ("Cox"), the Laboratory Director.

The Plaintiff filed a workers' compensation claim due to an injury she sustained in January of 2009. Due to her injury, the Plaintiff initially had a lifting restriction of ten pounds. She was later placed on a permanent thirty-pound lifting restriction. On November 5, 2009, St. John's informed Galvin-Stoeff it could no longer accommodate her lifting restriction on a permanent basis. The Plaintiff was discharged on February 5, 2010.

The Plaintiff filed a three-count Complaint against the Defendant alleging: (1) discharge based on gender and pregnancy in violation of Title VII (Count I); (2) discrimination based on disability in violation of the Americans with Disabilities Act ("ADA") ("Count II"); and (3) retaliatory discharge for benefits received under the Illinois Workers' Compensation

Act ("Count III").

The Defendant claims there is no genuine issue of material fact as to any issue and it is entitled to summary judgment as to each count. The Plaintiff alleges there are factual disputes which preclude the entry of summary judgment.

## II. FACTUAL BACKGROUND

### A. Essential Job Functions

As a Med Tech II, the Plaintiff was responsible for processing blood products received from sources outside the Hospital and for providing blood products to healthcare providers in the Neonatal Care and Intensive Care Units, as well for providing blood and blood products necessary for Level 1 Traumas and other medical emergencies. When providing blood and blood products to medical units, "time [was] of the essence." This meant that at times, the Plaintiff was required to get blood and products immediately to the patient unit.

The Defendant alleges that in emergency situations, the Plaintiff would have to physically transport blood and blood products to patient

floors.  The number of emergency situations fluctuated depending on the time of the year.  The Plaintiff disputes this allegation to the extent that because a pneumatic tube station was used to move blood products to other floors, she did not have to physically transport blood and blood products to other floors.  The only time she had to physically transport blood products to a patient area was for a level 1 trauma.  These products would be transported by a cooler that weighed less than 30 pounds.

At all relevant times, the Plaintiff worked the third shift from 10:30 p.m. to 7:00 a.m.  For most of her shift (from 11:00 p.m. to 6:00 a.m.), the Plaintiff was the only employee working in Transfusion Services and was solely responsible for providing blood and blood products to patient units. As the Med Tech II responsible for Transfusion Services on the night shift, the Plaintiff at times had to pick up blood or take blood down to the Hospital's Security Department during the night because blood was cabbed back and forth from different areas outside the Hospital.

When the Plaintiff was hired, the description for the Med Tech II position did not include any lifting requirement.  The position description

was revised in January of 1992, May of 1995 and June of 2001. It did not contain any lifting requirement after these revisions.

The position description was revised in September of 2009. The Med Tech II job description states that the employee "must be capable of stooping, bending, stretching and lifting" as essential functions of the position. However, the job description in effect at the time of the Plaintiff's permanent lifting restriction did not specify the actual poundage of weight lifting requirement. There is another position description showing a revision date of September 30, 2009, which states that the Med Tech II employee must be able to lift "a maximum of 66 pounds." The Defendant states this specific restriction was probably added because the Hospital may have realized it was missing from the description after realizing there were items employees needed to lift weighing 66 pounds.

Ann Cox, one of the Plaintiff's supervisors, testified the change was made to "make things more clear" and to "be more specific of what was required. Cox knew that the 66-pound lifting restriction would put Galvin-Stoeff out of a job if the Hospital did not accommodate her lifting

restriction.

The Defendant alleges that, while the Hospital did not get many 45-pound boxes of blood, it usually did in emergency situations. Gale Dial, the Plaintiff's supervisor, testified that if the Plaintiff was not able to lift the blood box in an emergency situation, it would not present a life threatening situation for a patient "as long as there is always someone there that can [lift the box] for her." The Plaintiff disputes this assertion, claiming that Defendant did not usually get 45 pound boxes of blood in an emergency situation. In an emergency, there would only be a few units of blood received and not a fully loaded 45-pound box. No life-threatening situation would be presented even if no one was present to assist Galvin-Stoeff. The Plaintiff claims if an emergency existed, she was able to move units of blood by herself even if a box weighed 45 pounds.

It was an essential job requirement of the Med Tech II position that the employee maintain a valid certification as a Medical Technologist certified by either the ASCP or CLS. Without such certification, a Med Tech II was not allowed to work in Transfusions Services or supervise Med

Tech I employees. Gale Dial testified that a Med Tech II would not be qualified for the position if she let her Medical Technologist certification expire. Galvin-Stoeff acknowledged that she did not maintain a Medical Technologist certification from July 2007 to March 2010. The Plaintiff testified she did not know that the certification had expired in July 2007, and she would have renewed the certification if she knew it had expired. At the time of her discharge from St. John's, the Plaintiff had not renewed her Medical Technologist certification and she did not do so until March 2010. The foregoing facts about her certification are immaterial because that factor had nothing to do with her discharge. Moreover, the Defendant allowed her to work during the period when her certification had lapsed.

B. Galvin-Stoeff's Workplace Injury

In January 2009, the Plaintiff injured her back while carrying a box of blood products at the Hospital. The Plaintiff was first diagnosed as having a back sprain in January 2009. In March 2009, Galvin-Stoeff was diagnosed with having bulging discs.

The Plaintiff testified that because of her bulging discs, she

experienced numbness in her leg and aching. She claims she was in constant pain. Galvin-Stoeff testified that she might get uncomfortable after sitting for an hour or two. She claims she has trouble sleeping at night and might get anywhere from nothing to three hours of sleep a night. The Plaintiff also says that her ability to perform household chores has been limited. She does not mow the grass and her husband does the vacuuming and laundry.

The Plaintiff testified she has neither seen a physician nor taken medication for her bulging discs since August 2009. Galvin-Stoeff's bulging discs did not result in restrictions related to her 2009 pregnancy, or her subsequent pregnancy in 2010.

The Defendant alleges that after her 2009 injury, St. John's accommodated the Plaintiff's lifting restrictions by allowing security staff to place the boxes of blood products on a cart for the Plaintiff. Galvin-Stoeff claims this was not done to accommodate her. The security staff had been placing the boxes on a cart even before her lifting restrictions.

The Hospital accommodated the Plaintiff by allowing her to work

light duty in her Med Tech II position from January 2009 to November 2009 while she was subject to the temporary restriction. As part of the light duty, St. John's allowed Galvin-Stoeff to leave the box on the cart and unpack the product a few pints at a time, instead of transporting the boxes directly to her desk for processing. Her desk was located 15 to 20 feet away from the cart.

The Plaintiff testified that the number of blood units she could unpack and process at a particular time depended on how comfortable she felt, and how much the phone was ringing. Galvin-Stoeff testified that "you can only have [blood products] sitting out for this many minutes before you're going to get into a critical window where it's too warm." The Plaintiff used an infrared device to check temperature of the blood products to make sure that quality control was maintained while the blood products stayed on the cart.

While most Med Techs were able to carry blood coolers to the trauma rooms when responding to traumas, the Plaintiff would first have to put an empty cooler on the cart, then fill up the cooler and then cart the box to

trauma. The Emergency Room staff would then have to remove the cooler from the cart. The Plaintiff disputes the foregoing allegation to the extent that ER staff had to remove coolers only when Galvin-Stoeff had a 10-pound lifting restriction–not after she had a 30-pound restriction.

The Defendant alleges that if a heavy box of blood products came into the Hospital, the Plaintiff would have to have someone lift the box onto the cart for her. If no one was around to help with the lifting, the Plaintiff would have to take a cart with her, put an empty box on the cart and transfer blood products from one box to another. If the Plaintiff could not find another box in the Transfusion Service room, she would leave the box at security and then go from room to room to transfer the blood products. The Plaintiff disputes these allegations and claims she did not need someone to lift the box for her. Moreover, she states she never left a box of blood products at security and then went room to room to transfer blood products.

### C. Galvin-Stoeff's Permanent Weight Restriction

On or about August 17, 2009, the Plaintiff's physician determined

that Plaintiff had achieved maximum medical improvement and that her 30-pound lifting restriction was permanent. The Plaintiff acknowledges that since October 2009, she has been unable to lift more than 30 pounds. The Hospital found out about the permanent weight restriction on September 18, 2009. Gail Dial, one of the Plaintiff's supervisors, suggested that the Hospital could accommodate her restrictions. However, Dial appeared to be concerned about overtime and scheduling and the possibility that other employees would not be available to lift heavy boxes.

On September 21, 2009, in response to Gail Dial's email, Worker's Compensation Facilitator Rosemary Beam sent an email to Dial, Kapp, Worker's Compensation Facilitator Connie Cardinell and Cox which stated:

> [I]t is up to the department if you want to [sic] Stacia to continue working with permanent lifting restrictions. However, it might cause some resentment within the department. If she works OT it sends a message to other employees that a person with permanent lifting restrictions can work OT. However, as she is now back in your cost center we have no objection to her working OT, other than the message it is sending to his [sic] fellow workers. You will be setting president [sic] within the department and other workers who have a WC injury would have to be allowed to work with permanent restrictions. In a similar situation, if other employees in your department have a WC injury and it has been determined they cannot lift heavy

boxes; they will have to have a note from their doctor stating they can no longer perform this function of their job. As you have/will accommodated Stacia, you will also have to accommodate their permanent restrictions. I hope this makes sense.

On September 21, 2009, Kapp responded to the Dial email by stating, "Gail, what does the job description require for her position?" On September 22, 2009, Dial responded by stating in part:

[I]f she was to have a heavy box that had to be shipped out (she could put an empty box on a cart, fill it, then push it to security) or shipped in, (security could place it on a cart for her, which she could push and empty from there). It is unusual to get the larger boxes on the night shift . . . If needed can she be required to work OT with the new permanent restriction?

Galvin-Stoeff first learned about the permanent weight restriction in October 2009 when she had a conversation with Dial. Dial told the Plaintiff that her worker's compensation physician, Dr. Bansil, had released the Plaintiff with a permanent weight restriction of 30 pounds. Dial also told the Plaintiff that Ann Cox "was concerned about [her] permanent restriction and that they needed to figure out if they were going to move [her] to another shift . . . [or] department." Dial told Galvin-Stoeff that St. John's would need to weigh items in the laboratory.

On October 18, 2009, Ann Cox sent an email to Dial, Kapp, Peggy Curtin and Gail Humphrey which stated:

> [A]fter further thinking about this issue of Stacia and the work restrictions, I feel that since the job codes are the same for all technologists, regardless of cost center and that several other sections must lift 30 liters of liquid, which is approximately 66 pounds, it is not fair to staff of the same job code to have different expectations just dependant on the cost center they are working under. With this in mind, I feel that we must release Stacia and have expectations on lifting equal for staff of the same job code.

The Plaintiff knows that sometime thereafter Dial and Cox had various items weighed in the Laboratory Department. Galvin-Stoeff does not know what items were weighed, as she never got any results back as to what individual things weighed.

In fact, at Cox's request, Dial weighed the various boxes that Med Techs are expected to lift. Dial determined that the heaviest box that employees were required to lift was up to 45 pounds, which were filled with ice and blood products. Dial, with the help of the staff, determined the weight of the box by placing the box on a scale located in the lab.

The Plaintiff met with Dial again sometime later in October 2009.

Dial told her that she did not think the Hospital had to do anything different with Galvin-Stoeff's position, but that she still had to speak to Cox about the matter. The Plaintiff had no further conversations with Dial about the topic. The next time that anyone addressed the weight restrictions with the Plaintiff was when Jean Kapp, the Hospital's employer relations manager, and Connie Cardinell, a worker's compensation facilitator, met with Galvin-Stoeff on November 5, 2009. At that meeting, Kapp told Galvin-Stoeff she would not be allowed to work in the Med Tech II position with the permanent lifting restriction. Kapp also provided the Plaintiff a letter stating that her employment status with the Hospital would be terminated effective February 5, 2010 if she was unable to find another position in the Hospital.

## D. Availability of other Positions

St. John's informed the Plaintiff on November 5, 2009 that she had a period of 90 days in which to apply for other positions for which she was qualified. The Hospital was in a hiring freeze as of November 5, 2009. The Plaintiff was not aware of any positions in any other department or

shift that were open on November 5, 2009 and that she was qualified to perform.  There also were not any vacant positions at the Hospital during the 90-day period that Plaintiff believed met her qualifications.

Galvin-Stoeff was discharged effective February 5, 2014 when she was unable to find an alternative position for which she was qualified.

E. Evidence regarding Comparable Employees

The Plaintiff alleges in her Complaint that the Hospital "accommodated other Medical Technologists with weight restrictions."  The employees to whom Galvin-Stoeff references in her Complaint are Zachary Clark, Tom Franke, Anne Powers and Beth Sheff.  Zachary Clark was a Med Tech II who worked in Microbiology (a specialized area).  The Plaintiff claims that the Hospital accommodated Clark by allowing him to work in a laboratory with crutches for several months.  Clark worked the day shift when other employees were in the Core Laboratory and could perform some of his job duties.

Tom Franke was a Med Tech I who worked in the Core Laboratory. The Plaintiff claims that Franke was not able to lift boxes and that "for a

couple of years . . . it was just like people worked around him." Franke worked at the same time with at least four or five Med Techs that could help him lift the boxes on the third shift.

Anne Powers was a Med Tech II in the Core Laboratory. Powers was in a wheelchair for a period of time and would have another coworker park her car, while Powers entered the back door of the Core Laboratory. Powers worked the day shift when there were other people around who could perform some of her job duties.

Beth Sheff was not employed as a Med Tech, but worked in Histology in the Core Laboratory. The Plaintiff claims Sheff had an open wound that had to drain for over a year, so there were tasks she could not perform. Moreover, she was unable to touch or be near certain items in the laboratory. Sheff also had other people working in the Laboratory during her shift that could help with her job duties.

F. Galvin-Stoeff's Pregnancy

The Plaintiff testified she found out she was pregnant the week before Halloween. Galvin-Stoeff claims her husband "let it slip on Facebook" and

thus a number of her co-workers knew about her pregnancy. The Plaintiff never told her supervisors Dial or Cox that she was pregnant.

The Plaintiff only told Teresa Cline, the scheduling coordinator for Transfusion Services, that she was pregnant. However, the Plaintiff claims that Cline told her she was going to tell the Plaintiff's supervisor, Gail Dial, that Plaintiff was pregnant. Cline denies knowing that Plaintiff was pregnant prior to her termination.

The Plaintiff testified she believes Dial knew she was pregnant because Dial told her "Congratulations" sometime before the Plaintiff's November 5, 2009 meeting with Kapp and Cardinell. Galvin-Stoeff also claims that when she told Kapp she was pregnant during that meeting, Kapp responded "I know your situation. . . ." The Plaintiff testified she took Kapp's comment to mean that Kapp knew the Plaintiff was pregnant prior to the November 5, 2009. Kapp denies having any knowledge of the pregnancy prior to the November 5, 2009 meeting. Cox and Dial also deny having any knowledge of the Plaintiff's pregnancy before November 5, 2009.

The Plaintiff alleges the Defendant had accommodated other employees who were pregnant, an assertion that Defendant disputes.

G. Complaint Allegations

The Plaintiff bases her pregnancy discrimination claim on the fact that her November 5, 2009 meeting occurred within a week after the Plaintiff's husband announced her pregnancy on Facebook. Galvin-Stoeff also speculates that the Hospital discharged her because her eventual pregnancy leave would occur during a time when the Hospital was historically short-staffed.

The Plaintiff alleges she was discharged because of her disability. She bases her claim on the fact that she was able to work as a Med Tech II in a light duty position from January 2009 to November 2009. Galvin-Stoeff also bases her disability discrimination claim on the fact that the Hospital revised the Med Tech II job description to include a weight requirement of 66 pounds. Ann Cox testified that position descriptions are reviewed periodically for accuracy, in accordance with recommendations from Joint Commission, the hospital's accrediting agency. Position descriptions may

also be reviewed for accuracy when questions come up as to what the job expectations are for a particular position.

The Plaintiff also alleges she was terminated for exercising her rights under the Illinois Worker's Compensation Act. Galvin-Stoeff's worker's compensation claim is premised on the fact that the Hospital accommodated her in a light duty position for more than 11 months before meeting with her on November 5, 2009. The Plaintiff further claims that other employees who needed accommodations were accommodated but those employees did not file worker's compensation claims. The Plaintiff also alleges her worker's compensation claim is supported by the fact that the Hospital changed the Med Tech II position description to a specific 66 pound lifting restriction sometime after receiving notice of the Plaintiff's permanent lifting restriction.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  The Court construes all inferences in favor of the Plaintiff.  See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011).  To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."  See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).  Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion.  See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.  See id.

B. Title VII Pregnancy Claim

The Pregnancy Discrimination Act amended Title VII to prohibit employment discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  A plaintiff may use the direct method or indirect method to prove such a claim.  See Hitchcock v. Angel Corps, Inc., 718 F.3d 733, 737 (7th Cir.

2013). In proceeding under the direct method, a plaintiff may use direct or circumstantial evidence in purporting to show her employer had a discriminatory motivation. See id. The indirect method involves application of the familiar standard articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See id.

(1) Direct Method

"To survive summary judgment under the direct method, a plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable issue as to whether pregnancy was a motivating factor in her discharge." Makowski v. SmithAmundsen LLC, 662 F.3d 818, 824 (7th Cir. 2011) (internal quotation marks and citation omitted). Galvin-Stoeff does not rely on direct evidence. "A plaintiff may also construct a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." Id. (internal quotation marks and citation omitted). The circumstantial evidence must point directly to a discriminatory reason for the challenged action. See Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540, 548 (7th Cir. 2011).

In Serednyj, the court discussed what is generally necessary to establish a convincing mosaic of circumstantial evidence, as follows:

> [Plaintiff's] mosaic may be comprised of three categories of circumstantial evidence, each of which is sufficient by itself to support a judgment for the plaintiff. The first category consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent may be drawn. The second category consists of evidence that similarly situated employees outside of the protected group (pregnancy, sex, race, etc.) received systematically better treatment. The third category consists of evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

Id. (internal quotation marks and citation omitted).

The Defendant contends the Plaintiff's pregnancy discrimination claim must fail because she has offered no evidence of an admission or discriminatory statement to support her claim. St. John's alleges Galvin-Stoeff's pregnancy discrimination claim is premised entirely on the fact that her November 5, 2009 meeting with Kapp and Campbell occurred within a week of the Plaintiff's husband announcing her pregnancy on Facebook.

The Plaintiff does rely on suspicious timing, noting that she was removed from her position within a week of her husband announcing her pregnancy. Galvin-Stoeff alleges she was congratulated by Gale Dial and Jean Kapp stated that she knew about the Plaintiff's situation and apologized.

The problem with the Plaintiff's argument is that it appears from the evidence that the decision as to her employment status was made before her pregnancy was known. Attached as Exhibit M to the Hospital's Motion is an email from Laboratory Director Ann Cox to Gale Dial, Jean Kapp and Peggy Curtin. Gail Humphrey is also copied on the email. The email is dated October 18, 2009.[1] The subject line reads "workers comp issue." The body of the email states, "Subject: Stacia Galvin – work restrictions of

---

[1] This email is a follow-up to emails sent in September of 2009, in response to an email from Rosemary Beam as to whether Galvin-Stoeff's permanent lifting restriction of 30 pounds and other restrictions could be accommodated. On September 21, 2009, Dial stated "she would like to say yes we can," while at the same time expressing some concerns. A September 22, 2009 email from Dial questioned whether Galvin-Stoeff could be required to work overtime and be available on-call to work different shifts and to help with emergencies. An email from Rosemary Beam expressed concern over the message it would send and the potential need to accommodate the permanent restrictions of other employees.

lifting 30 pounds or less." The remainder of the email states:

> After further thinking about this issue of Stacia and work restrictions, I feel that since the job codes are the same for all technologists, regardless of cost center and that several other sections must lift 30 liters of liquid which is approximately 66 pounds, it is not fair to staff of the same job code to have different expectations just dependent on the cost center they are working under.
>
> With this in mind, I feel that we must release Stacia and have expectations on lifting equal for staff of the same job code.

An October 20, 2009 email from Jean Kapp to Connie Cardinell and Rosemary Beam forwards Cox's email and states: "See below – Does not look like Stacia will be able to return to her previous position. I know there is some discussion between Gale and Ann so I am waiting to see if this is the final determination, but it looks like it will be."

Because the undisputed evidence establishes that the decision to "release" the Plaintiff was made before her pregnancy was announced, Galvin-Stoeff's argument about suspicious timing falls apart. Therefore, even when the facts are viewed in a light most favorable to the Plaintiff, the Court finds that pregnancy was not a motivating factor in the Plaintiff's discharge. Accordingly, the Court concludes that Plaintiff is unable to

construct a convincing mosaic of circumstantial evidence of pregnancy discrimination based on suspicious timing. Because Galvin-Stoeff's argument pursuant to the direct method is based entirely on suspicious timing, the Defendant is entitled to judgment as a matter of law on this point.

## (2) Indirect Method

The Plaintiff may also attempt to withstand summary judgment on her pregnancy discrimination claim pursuant to the indirect method. To do so, Galvin-Stoeff must present prima facie evidence that: (1) she was pregnant and the Hospital knew of the pregnancy; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated non-pregnant employees were treated more favorably. See Silverman v. Board of Educ. of City of Chicago, 637 F.3d 729, 736 (7th Cir. 2011). If the Plaintiff is able to meet her burden, then the Defendant must produce a legitimate, non-discriminatory reason for terminating her employment. See id. If the Defendant meets its burden of production, then the Plaintiff would have to produce evidence that the

challenged reason is a pretext for unlawful discrimination.  See id.

The Plaintiff's pregnancy discrimination claim under the indirect method fails for the same reason that it did under the direct method.  The Hospital did not know Galvin-Stoeff was pregnant when Laboratory Director Ann Cox made the decision to "release" her.

Based on the foregoing, even when all inferences are construed in favor of the Plaintiff, the Court concludes that Defendant is entitled to summary judgment on the Plaintiff's pregnancy discrimination claims.

C. ADA claims

(1) Failure to Accommodate

In order to withstand summary judgment on a failure to accommodate claim, an ADA plaintiff must generally point to a factual dispute as to whether "(1) she is disabled; (2) she is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of the disability."  Majors v. General Elec. Co., 714 F.3d 527, 533 (7th Cir. 2013).  To qualify as disabled, a plaintiff must have: "(A) a

physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The ADA defines "lifting" as a major life activity. See 42 U.S.C. § 12102(2)(A).

The Defendant first asserts that Plaintiff is not "disabled" within the meaning of the ADA. The Plaintiff suffers from bulging discs. In order to establish this impairment constitutes a disability, the Plaintiff must show that it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). However, not every impairment constitutes a disability. See id.

It is undisputed that Galvin-Stoeff's bulging discs prevent her from lifting more than 30 pounds. Although the Defendant cites cases from outside this circuit for the proposition that a 30-pound lifting restriction does not constitute a substantial limitation in the life function of working,

the cases relied on by the Defendant pre-date the ADA's 2008 amendments. The amended ADA provides that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Lifting is a major life activity under today's law. See 42 U.S.C. § 12102(2)(A); ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Based on the 30-pound lifting restriction, therefore, the Court concludes there is at least a factual dispute regarding whether the Plaintiff has a physical impairment which substantially limits a major life activity. For purposes of this motion, she therefore qualifies as disabled.

The next factor is whether the Plaintiff was able to perform the essential functions of her job with or without a reasonable accommodation. Galvin-Stoeff alleges that even with the lifting restriction, she was able to adequately perform her job at St. John's and all of its functions. However, the testimony cited by the Plaintiff refers to the period between January of 2009 and November of 2009 when she was permitted by the Hospital to

work light duty because of her temporary lifting restriction during this period. At the time, the Hospital accommodated Galvin-Stoeff's lifting restrictions by allowing security staff to place the boxes of blood products on a cart. Additionally, St. John's permitted the Plaintiff to leave the box on the cart and unpack the products a few packs at a time, instead of transporting each box to her desk for processing. Accordingly, the evidence does not establish that Plaintiff was able to perform the Med Tech II position without an accommodation.

The next consideration is whether a reasonable accommodation existed. The ADA envisions a "flexible, interactive process by which the employer and employee determine the appropriate reasonable accommodation," a process which requires a great deal of communication. Rehling v. City of Chicago, 207 F.3d 1009, 1015 (7th Cir. 2000). Here, it does not appear there was much communication at all. The Plaintiff's supervisors and the Hospital's Worker's Compensation Facilitator emailed and talked amongst themselves about how Galvin-Stoeff might be accommodated. Because the Plaintiff was not privy to these

communications, it could not be described as an interactive process. The Plaintiff was simply told on November 5, 2009 that she had to find another job at St. John's or she would be terminated in 90 days.

However, a plaintiff may not base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process. See id. at 1016. "[A] plaintiff must allege that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." Id.

The Court is unable to conclude that the Hospital's failure to engage in an interactive process was the reason no accommodation was made. The Plaintiff must show that a reasonable accommodation existed. See Ozlowski v. Henderson, 237 F.3d 837, 840 (7th Cir. 2001). Galvin-Stoeff does not identify any accommodation that could have been made in this case. Rather, she claims she could perform the job without an accommodation. The Plaintiff bases this assertion on the fact that the Hospital accommodated her lifting restrictions for nine months following her injury. Accordingly, the Plaintiff is essentially claiming that the

Hospital should eliminate the lifting restriction.

Because the Plaintiff has offered no evidence that a reasonable accommodation existed, the Court concludes that Defendant's failure to engage in an interactive process is harmless.

The Plaintiff is unable to establish that she could perform the essential job functions of a Med Tech II position either with or without a reasonable accommodation.

To the extent that Plaintiff contends she should have been re-assigned at the Hospital, it is the employee's burden to show that another position for which she is qualified existed.  See Pond v. Michelin North America, Inc., 183 F.3d 592, 595 (7th Cir. 1999).  Galvin-Stoeff was not aware of any other open positions at the Hospital that she was qualified to perform on November 5, 2009, or at the end of the ensuing 90-day period.

Because the Plaintiff is unable to create a genuine issue of material fact regarding whether she is qualified to perform the essential functions of her job with or without a reasonable accommodation, the Court concludes that Defendant is entitled to summary judgment on the Plaintiff's failure

to accommodate claim.

(2) ADA Discrimination

A plaintiff can prove disability discrimination under the ADA by using either the direct or indirect method of proof. See Dickerson v. Bd. of Trustees of Community College Dist. 522, 657 F.3d 595, 601 (7th Cir. 2011). Pursuant to the direct method, a plaintiff may rely on either direct or circumstantial evidence. See id. A plaintiff relying on direct evidence must point to an admission by the decision-maker that her actions were based upon the prohibited animus. See id.

The Plaintiff contends she has established discrimination through direct evidence because the Defendant admits she was terminated because of her disability. However, the passage cited by the Plaintiff does not say Galvin-Stoeff was terminated because of her disability. It merely says the Plaintiff was told she would not be allowed to work as a Med Tech II with the permanent lifting restriction. This is not an admission by the Defendant that Plaintiff is being terminated because of her disability.

Under the indirect method, a plaintiff establishes a prima facie case

32

of disability discrimination by showing "(1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." Cloe v. City of Indianapolis, 712 F.3d 1171, 1182 (7th Cir. 2013). When a plaintiff meets its burden, the employer must point to a legitimate, non-discriminatory reason for the challenged action. See id. If the employer satisfies this requirement, then the plaintiff must establish by a preponderance of the evidence that the proffered justification is a pretext for a discriminatory reason. See id.

Assuming Galvin-Stoeff can meet the first three elements, the Court finds that she cannot point to any similarly situated employees who were treated more favorably. Although the Plaintiff alleges that the Hospital accommodated other Med Techs with weight restrictions, the evidence establishes that the circumstances of the other cases were different.

Zachary Clark was a Med Tech II. Although he was on crutches for several months, Clark worked the day shift when other employees were

available to help him.  Tom Franke, a Med Tech I with lifting restrictions, worked at the same time as four or five other Med Techs who could help him lift the boxes.  Anne Powers, a Med Tech II in the Core Laboratory, was in a wheelchair for a period of time.  However, Powers worked the day shift when other people were available to perform some of her duties.  Beth Sheff worked in Histology in the Core Laboratory.  Although there were work tasks she could not perform due to an open wound, there were others working in the laboratory who could assist with some of her tasks.

Because the Plaintiff was the only employee working in Transfusion Services for most of her shift, there was no one available to assist Galvin-Stoeff with the tasks that she was unable to perform because of her lifting restrictions.  Accordingly, the Plaintiff is not similarly situated to the above-named individuals and she cannot establish that these other employees were treated more favorably.  Moreover, the Plaintiff has pointed to no other employees who worked alone and had lifting restrictions that were accommodated by St. John's.  Therefore, the Plaintiff cannot assert a prima facie case of disability discrimination based on the ADA.

Based on the foregoing, the Court concludes that even when all inferences are construed in favor of the Plaintiff, the Defendant is entitled to summary judgment.

## D. State law retaliatory discharge

In Count III, the Plaintiff asserts a claim for retaliatory discharge under Illinois law.

The purpose of the Illinois Worker's Compensation Act is "to afford protection to employees by providing them with prompt and equitable compensation for their injuries." Kelsay v. Motorola, Inc., 74 Ill.2d 172, 180-81 (1978). "An employee may recover for retaliatory discharge if he proves (1) that he was an employee before the injury; (2) that he exercised a right granted by the Workers' Compensation Act; and (3) that he was discharged and that the discharge was causally related to his filing a claim under the Workers' Compensation Act." Brooks v. Pactiv Corp., 729 F.3d 758, 767 (7th Cir. 2013). Although the "retaliatory-discharge cause of action is a narrow and limited exception to the employment-at-will doctrine," it serves to prevent employers from forcing employees to choose

between keeping their jobs or pursuing compensation for injuries. See id.

Because no federal claims remain, the Court declines to exercise jurisdiction over the Plaintiff's supplemental state law claims. See 28 U.S.C. § 1367(c)(3); see also Sharp Electronics Corp. v. Metropolitan Life Ins. Co., 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks omitted).

<u>Ergo</u>, the Defendant's Motion for Summary Judgment [d/e 15] is ALLOWED.

Counts I and II are Dismissed with Prejudice.

The Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claim. Therefore, Count III is Dismissed without Prejudice.

Any future deadlines and/or Court settings are Vacated.

The Clerk shall terminate this case.

ENTER: August 14, 2014

FOR THE COURT:

                              s/Richard Mills

                             Richard Mills

                             United States District Judge